# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 30, 2005        Decided August 18, 2006

No. 04-5315

BEVERLY A. FIELDS,
APPELLEE

v.

OFFICE OF EDDIE BERNICE JOHNSON, EMPLOYING OFFICE,
UNITED STATES CONGRESS,
APPELLANT

---

No. 04-5335

BRAD HANSON,
APPELLEE

v.

OFFICE OF SENATOR MARK DAYTON,
APPELLANT

---

Appeals from the United States District Court
for the District of Columbia
(No. 04cv00717)
(No. 03cv01149)

---

*William F. Allen*, Attorney, Office of House Employment Counsel, argued the cause for appellant in No. 04-5315. With him on the briefs was *Kimberly Carey Williams*, Attorney. *Gloria L. Ferguson*, Attorney, entered an appearance.

*Geraldine R. Gennet*, General Counsel, U.S. House of Representatives, and *Kerry W. Kircher*, Deputy General Counsel, were on the brief for *amicus curiae* Bipartisan Legal Advisory Group of the United States House of Representatives in No. 04-5315.

*Henry J. Hyde*, pro se, was on the brief for *amicus curiae* Congressman Henry J. Hyde in support of appellant in No. 04-5315.

*Wayne Marcus Scriven* argued the cause and filed the brief for appellee in No. 04-5315.

*Jean M. Manning*, Chief Counsel, Office of Senate Chief Counsel for Employment, argued the cause for appellant in No. 04-5335. With her on the briefs was *Toby R. Hyman*, Senior Counsel. *Mary S. Bach*, Counsel, entered an appearance.

*Richard A. Salzman* argued the cause for appellee in No. 04-5335. With him on the brief were *Douglas B. Huron* and *Tammany M. Kramer*.

Before: GINSBURG, *Chief Judge*, and SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, BROWN, and GRIFFITH, *Circuit Judges*.[*]

---

[*] Circuit Judges Garland and Kavanaugh did not participate in this matter.

Opinion for the Court in part filed by *Circuit Judge* RANDOLPH, an opinion in which *Chief Judge* GINSBURG and *Circuit Judges* HENDERSON and TATEL join.

Opinion concurring in part and in the judgment filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Circuit Judge* TATEL.

Opinion concurring in the judgment filed by *Circuit Judge* BROWN, with whom *Circuit Judges* SENTELLE and GRIFFITH join.

RANDOLPH, *Circuit Judge*:  Article I, section 6 of the Constitution provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."  We ordered these two appeals to be argued together en banc in order to determine whether the Speech or Debate Clause requires dismissal of these suits brought under the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1301-1438, and whether *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923 (D.C. Cir. 1986), should remain the law of this circuit.

I.

No. 04-5315 is an appeal from a district court order denying a motion to dismiss a complaint alleging that the Office of Representative Eddie Bernice Johnson discriminated against Beverly A. Fields because of her race and gender and retaliated against her for objecting to discriminatory conduct.  No. 04-5335 is an appeal from a district court order denying a motion to dismiss a complaint alleging that the Office of Senator Mark Dayton discriminated against Brad Hanson because of a perceived disability and violated the Fair Labor Standards Act.

4

The Office of Representative Johnson and the Office of Senator Dayton (collectively, the "Member Offices") claim that the Speech or Debate Clause immunizes them from these suits and that the district court should have dismissed the complaints for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1).[1]

A.

Fields and Hanson each sued under the Accountability Act. The Act confers on "covered employees" rights and remedies drawn from various labor and employment statutes not previously applicable to the legislative branch.[2] 2 U.S.C. § 1302(a); *see id.* §§ 1311-16, 1331, 1341, 1351. It also includes an anti-retaliation provision that prohibits "an employing office" from "intimidat[ing], tak[ing] reprisal against, or otherwise discriminat[ing] against, any covered employee because the covered employee has opposed" or

---

[1] Although we do not ordinarily have jurisdiction to review an order denying a motion to dismiss because such an order is not "final" under 28 U.S.C. § 1291, *Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 253 (D.C. Cir. 2003), "[i]ssues of Speech or Debate Clause immunity may be immediately appealed," *Browning*, 789 F.2d at 926 n.6 (citing *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979)).

[2] Of particular relevance here, the Accountability Act incorporates portions of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213, the Family and Medical Leave Act of 1993, Pub. L. No. 103-3, 107 Stat. 6 (codified as amended in scattered sections of Titles 2, 5, and 29 of the U.S. Code), and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796*l*. *See* 2 U.S.C. § 1302(a).

reported "any practice made unlawful" by the Accountability Act. *Id.* § 1317(a). A "covered employee" is an individual employed by the House of Representatives, the Senate, or some other office specifically enumerated in the statute. *Id.* § 1301(3).[3]

Section 1404(2) creates a cause of action for covered employees to sue in federal court for violations of the Accountability Act. Section 1408(a) vests the "district courts of the United States" with "jurisdiction over any civil action commenced under section 1404." Before initiating such an action, the employee must seek counseling by, and mediation with, the Office of Compliance, *id.* § 1408(a); *see* §§ 1402-1403, "an independent office within the legislative branch," *id.* § 1381(a). Thereafter, the employee may bring an action against "the employing office alleged to have committed the violation, or in which the violation is alleged to have occurred." *Id.* § 1408(b). An "employing office" for these purposes includes "the personal office of a Member of the House of Representatives or of a Senator." *Id.* § 1301(9)(A).

Fields, an African American female and the plaintiff in No. 04-5315, served as Representative Johnson's chief of staff from January 2002 until her discharge in early 2004. The parties agree that as chief of staff, Fields was deeply involved in a wide array of Representative Johnson's legislative work. Fields's complaint alleged as follows. Elisabeth Howie, a "Black Latino," worked as an executive assistant and scheduler for the Office of Representative Johnson. In April 2003, the office decided to replace Howie with "an Asian person under the age of 40." Fields objected, but her objections were rebuffed, and

---

[3] The statute also protects former employees and applicants for employment. 2 U.S.C. § 1301(4).

she was directed to give Howie one day's notice that she was being terminated.

After Fields made her objections to Howie's termination known around the office, her co-workers began falsely accusing her of poor performance. Fields alleged they did so because they wanted "a Caucasian male rather than an African American female" to be Representative Johnson's chief of staff. Their efforts eventually succeeded when the Office of Representative Johnson promoted a non-African American male employee to chief of staff and demoted Fields to administrative assistant. The Office of Representative Johnson increased the new chief of staff's salary by approximately $10,000 – something it failed to do for Fields despite promising her a salary increase when she was chief of staff.

Fields filed an employment discrimination complaint with the Office of Compliance on December 18, 2003, and began the required counseling and mediation. While this was going on, the Office of Representative Johnson "initiated a bad faith and bogus investigation of plaintiff's conduct as an employee . . . to embarrass plaintiff before her co-workers and to force plaintiff to resign from her employment position." When Fields refused either to drop her discrimination claims or to resign, she was abruptly terminated. In response to this additional retaliation, Fields filed a second employment discrimination complaint with the Office of Compliance on March 11, 2004, and again complied with the counseling and mediation requirements.

After exhausting her administrative remedies, Fields sued the Office of Representative Johnson under the Accountability Act. She alleged racial and gender discrimination in violation of 2 U.S.C. § 1311(a)(1) (incorporating § 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2), equal pay discrimination in violation of 2 U.S.C. § 1313(a)(1) (incorporating §§ 6(a)(1) and

(d), 7, and 12(c) of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206(a)(1), (d), 207, 212(c)), and two counts of retaliation in violation of 2 U.S.C. § 1317(a). The Office of Representative Johnson moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1), asserting immunity from suit under the Speech or Debate Clause. The district court denied the motion to dismiss without explanation. After ordering en banc review, we granted Representative Johnson's motion to intervene for the limited purpose of asserting her Speech or Debate Clause immunity.

Brad Hanson, the plaintiff in No. 04-5335, joined Senator Dayton's Senate campaign in July 2000 and began serving as State Office Manager in Senator Dayton's Ft. Snelling, Minnesota, office upon the Senator's election to office. Hanson's complaint alleged as follows. Hanson's work for Senator Dayton centered on "setting up the Senator's three local offices in Minnesota" and overseeing "the transition of the Health Care Help Line to Senator Dayton's personal Senate office."[4] The Health Care Help Line "offered assistance to people having difficulties with their health insurance carriers, HMO's or physicians." This work often required Hanson, an employee entitled to overtime pay under the Fair Labor Standards Act, to work overtime. The Office of Senator Dayton never paid him for this overtime, even though the Office "recognized" his "effectiveness" by increasing his salary and paying him a bonus in January 2002.

Hanson began experiencing cardiac arrhythmia early in 2002. His physician advised him to undergo a coronary

---

[4] The parties agree that Hanson spent much of his time working on the Health Care Help Line, but they disagree about whether this and other assistance Hanson provided to Senator Dayton constituted legislative activities or merely "constituent services."

ablation. The surgery would require only a short hospital stay, but Hanson would need two to three weeks away from work to recover. Hanson informed his co-workers that he needed heart surgery and arranged a short meeting with Senator Dayton on July 3, 2002, in the Ft. Snelling office to share the news with him. "The meeting had not gone on for more than five minutes when the Senator abruptly told Hanson, 'You're done,'" without explanation. Senator Dayton told Hanson to stop reporting to the office and to take medical leave instead. Matt McGowan, Senator Dayton's Washington Office Manager, later called Hanson at home to inform him that "he would be terminated as of September 30." Hanson then underwent coronary ablation and fully recovered.

Hanson sued the Office of Senator Dayton under the Accountability Act after exhausting his administrative remedies. His complaint accused the Office of Senator Dayton of violating 2 U.S.C. § 1312(a) (incorporating §§ 101-105 of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2611-2615), discriminating against him on the basis of a perceived disability in violation of 2 U.S.C. § 1311(a)(3) (incorporating § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, and §§ 102-104 of the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12112-12114), and failing to pay him overtime compensation in violation of 2 U.S.C. § 1313 (incorporating the aforementioned provisions of the Fair Labor Standards Act). The Office of Senator Dayton asserted immunity from suit under the Speech or Debate Clause and moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1).[5] The district court denied the motion without explanation.

---

[5] The Office of Senator Dayton later filed an answer denying Hanson's allegations.

B.

Relying on *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923 (D.C. Cir. 1986), the Member Offices argue that the district court lacked jurisdiction and should have dismissed these suits because the Speech or Debate Clause immunizes them from suits challenging personnel decisions concerning employees like Fields and Hanson who assist Members in performing legislative functions.

In *Browning*, a former employee of the House of Representatives sued the Speaker and other House officers for employment discrimination. *Id.* at 924 & n.2. Browning was "the first black Official Reporter employed by the United States House of Representatives." *Id.* at 924. She claimed that despite some poor performance on the job, "the true reason behind her dismissal was racial animus." *Id.* We held that a Member's personnel decision is shielded from judicial scrutiny when "the [affected] employee's duties were directly related to the due functioning of the legislative process." *Id.* at 929 (emphasis removed).

Later decisions cast doubt on *Browning*. Two years after *Browning*, the Supreme Court ruled that a state-court judge did not have "absolute immunity from a suit for damages under 42 U.S.C. § 1983 for his decision to dismiss a subordinate court employee." *Forrester v. White*, 484 U.S. 219, 220 (1988). The Court described its "absolute official immunity" jurisprudence as "quite sparing," citing as examples legislative immunity under the Speech or Debate Clause and Presidential immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). *Forrester*, 484 U.S. at 224-25.[6] Consistent with the narrowness of absolute

---

[6] The Court characterized its decisions interpreting the Speech or Debate Clause as being "careful not to extend the scope of the

immunity in these contexts, the Court explained that judges are entitled to absolute immunity only for "judicial acts," not "administrative, legislative, or executive functions," *id.* at 227, no matter how "essential" such functions may be "to the very functioning of the courts," *id.* at 228. The Court then concluded that the employment decision in *Forrester* was an administrative, not a judicial, act and that the state-court judge therefore was not entitled to absolute immunity. *Id.* at 229-30.

*Gross v. Winter*, 876 F.2d 165 (D.C. Cir. 1989), presented the question whether common law legislative immunity exempted a D.C. Councilmember's personnel decisions from judicial review. We recognized that *Browning*'s focus on "the duties of the employee" as the "ultimate issue" was "unquestionably [in] tension" with *Forrester*, "which accords no weight to the duties of the employee." *Winter*, 876 F.2d at 170 (quoting *Browning*, 789 F.2d at 928) (internal quotation mark omitted; emphasis removed). We found "*Forrester*, not *Browning*, controlling" and concluded that "the functions judges and legislators exercise in making personnel decisions affecting [probation officers and legislative aides, respectively] are administrative, not judicial or legislative." *Id.* at 172.

Now a conflict in the circuits has developed. In *Bastien v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301 (10th Cir. 2004), *cert. denied*, 126 S. Ct. 396 (2005), a case brought under the Accountability Act, the Tenth Circuit held that the Speech or Debate Clause bars judicial review of a Senator's allegedly discriminatory personnel decision only when the plaintiff's claim "question[s] the conduct of *official* Senate

[Clause's] protection further than its purposes require." 484 U.S. at 224. The Court described the President's absolute immunity as resting on the President's "'unique position in the constitutional scheme.'" *Id.* at 225 (quoting *Fitzgerald*, 457 U.S. at 749).

legislative business." *Id.* at 1304 (emphasis added). The court was "hesita[nt] to embrace th[e] test" we employed in *Browning*, which it considered inconsistent with the Supreme Court's Speech or Debate Clause jurisprudence. *Id.* at 1318-19.

## II.

The Accountability Act allows an employee of the House or Senate to recover damages and seek injunctive relief from a Member's personal office "alleged to have committed [a] violation [of the Accountability Act], or in which the violation is alleged to have occurred." 2 U.S.C. § 1408(b); *id.* § 1301(3), (9); *see, e.g., id.* §§ 1311(b)(1), 1312(b), 1313(b).[7] Congress thereby unequivocally waived the sovereign immunity of a Member's personal office facing such allegations. *See Lane v. Peña*, 518 U.S. 187, 192 (1996). Congress also provided in § 1413 that § 1408 "shall not constitute a waiver of sovereign immunity for any other purpose, or of the privileges of any Senator or Member of the House of Representatives under article I, section 6, clause 1, [the Speech or Debate Clause] of the Constitution." The Accountability Act therefore does nothing to a Member's Speech or Debate Clause immunity, and we must determine how that immunity operates in suits under the Accountability Act.

---

[7] After midnight of the first day of the 104th Congress, the House passed the Act with little debate and without a committee hearing or a committee vote; the Senate passed its version a few days later, again with scarcely any debate and no hearings; there was no conference committee; and even the Senate bill's sponsor lamented the lack of consideration given to this legislation. *See* James T. O'Reilly, *Collision in the Congress: Congressional Accountability, Workplace Conflict, and the Separation of Powers*, 5 GEO. MASON L. REV. 1, 3-4 (1996).

12

The Speech or Debate Clause reinforces the separation of powers and protects legislative independence. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (quoting *United States v. Brewster*, 408 U.S. 501, 507 (1972); *United States v. Johnson*, 383 U.S. 169, 178 (1966)); *Gravel v. United States*, 408 U.S. 606, 616 (1972); *Powell v. McCormack*, 395 U.S. 486, 503 (1969); *Tenney v. Brandhove*, 341 U.S. 367, 373 (1951).[8] As to the judicial branch, the Clause can protect Members "from inquiry into legislative acts or the motivation for actual performance of legislative acts," *Brewster*, 408 U.S. at 508, "from the burden of defending" certain suits, *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (per curiam), and "from the consequences of litigation's results," *id. See United States v. Helstoski*, 442 U.S. 477, 487, 489 (1979); *Doe v. McMillan*, 412 U.S. 306, 318 (1973); *Powell*, 395 U.S. at 502-03, 505; *Johnson*, 383 U.S. at 173; *Tenney*, 341 U.S. at 377. In each case, the Clause must be applied "in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government." *Brewster*, 408 U.S. at 508.

---

[8] The Speech or Debate Clause was adopted by the Founders "without discussion and without opposition." *Johnson*, 383 U.S. at 177; *see* 5 THE DEBATES IN THE SEVERAL STATE CONVENTIONS, ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA, IN 1787, at 378, 406 (Jonathan Elliot ed., 2d ed. William S. Hein & Co. 1996) (1891); 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 246 (Max Farrand ed., 1966). The historical antecedents of the Clause are discussed in Justice Frankfurter's opinion for the Court in *Tenney*, 341 U.S. at 372-75, and in Justice Harlan's opinion for the Court in *Johnson*, 383 U.S. at 177-83. *See also Powell*, 395 U.S. at 502-03; *Gravel*, 408 U.S. at 652-59 (Brennan, J., dissenting); 2 THE FOUNDERS' CONSTITUTION 318-45 (Philip B. Kurland & Ralph Lerner eds., 1987).

13

The parties accept these principles and urge us to resolve broad questions related to suits under the Accountability Act: can a Member's personal office invoke the Speech or Debate Clause on the Member's behalf, as legislative aides and committees can?[9] is a personnel decision *always* an administrative act,[10] or could a personnel decision be a legislative act in certain circumstances?[11] and so forth. "These are perplexing questions. Their difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case[s]." *Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 372-73 (1955); *see Longshoremen v. Boyd*, 347 U.S. 222, 224 (1954). We therefore begin with the validity of our decision in *Browning*.

A.

The Speech or Debate Clause protects a Member's conduct if it is an integral "part of . . . the due functioning of the [legislative] process." *Brewster*, 408 U.S. at 516 (emphasis removed); *accord Gravel*, 408 U.S. at 625. The Clause obviously covers core legislative acts – "how [a Member] spoke, how he debated, how he voted, or anything he did in the chamber or in committee." *Brewster*, 408 U.S. at 526; *see also*

_____

[9] *See Gravel*, 408 U.S. at 616-18; *see also McMillan*, 412 U.S. at 312-13; *Tenney*, 341 U.S. at 379.

[10] *Cf. Forrester v. White*, 484 U.S. 219, 228-29 (1988); *Gross v. Winter*, 876 F.2d 165, 170-72 (D.C. Cir. 1989).

[11] *Cf. Bogan v. Scott-Harris*, 523 U.S. 44 (1998); *Rateree v. Rockett*, 852 F.2d 946, 950-51 (7th Cir. 1988).

*Bastien*, 390 F.3d at 1314.[12] But the Supreme Court has long held that the Clause does more.[13] It protects acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House

---

[12] *See, e.g.*, *Gravel*, 408 U.S. at 625 ("The heart of the Clause is speech or debate in either House."); *Brewster*, 408 U.S. at 512 ("A legislative act has consistently been defined as an act generally done in Congress in relation to the business before it. . . . [T]he Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts."); *Kilbourn*, 103 U.S. at 204 (protecting "things generally done in a session of the House by one of its members in relation to the business before it"); *see also Coffin v. Coffin*, 4 Mass. (1 Tyng) 1, 31 (1808) ("[I]t must appear that some language or conduct of his, in the character of a representative, is the foundation of the prosecution, for in no other character can he claim the privilege.").

[13] Over the years, the Supreme Court has articulated a number of different formulations to describe what the Speech or Debate Clause protects. *See, e.g.*, *Helstoski*, 442 U.S. at 489 ("The Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts. It precludes any showing of how [a legislator] acted, voted, or decided." (alteration in original; citation and internal quotation marks omitted)); *U.S. Servicemen's Fund*, 421 U.S. at 501 ("The question to be resolved is whether the actions of the [Member] fall within the 'sphere of legitimate legislative activity.'" (footnote omitted)); *Johnson*, 383 U.S. at 180 ("[A] charge . . . that the Congressman's conduct was improperly motivated . . . is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry."); *Tenney*, 341 U.S. at 376 (inquiring "whether from the pleadings it appears that the defendants were acting in the sphere of legitimate legislative activity"); *see also Coffin*, 4 Mass. (1 Tyng) at 27 (protecting "every thing said or done by [a Member] in the exercise of the functions of that office").

proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. And the Clause provides further protection in precluding "inquiry . . . into the motivation for" acts "that occur in the regular course of the legislative process." *Helstoski*, 442 U.S. at 489 (quoting *Brewster*, 408 U.S. at 525); *accord Johnson*, 383 U.S. at 180. In defining these categories of protected conduct, the Court has been careful not "to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process." *Brewster*, 408 U.S. at 516. The Speech or Debate Clause therefore "does not prohibit inquiry into illegal conduct simply because it has *some nexus* to legislative functions," *id.* at 528 (emphasis added), or because it is merely "related to," as opposed to "part of," the "due functioning" of the "legislative process," *id.* at 514 (emphasis removed).

Fields and Hanson contend that personnel decisions never can be "an integral part of the deliberative and communicative processes" in which Members engage as legislators, *Gravel*, 408 U.S. at 625, because personnel decisions never have more than merely "some nexus to legislative functions," *Brewster*, 408 U.S. at 528; *see id.* at 513-16. We agree that some personnel decisions would not qualify. The legislative process at the least includes "delivering an opinion, uttering a speech, or haranguing in debate";[14] proposing legislation;[15] voting on legislation;[16]

---

[14] *Tenney*, 341 U.S. at 374 (quoting *Coffin*, 4 Mass. (1 Tyng) at 27); *accord Brewster*, 408 U.S. at 526 (protecting "how [a Member] spoke, how he debated"); *see also Johnson*, 383 U.S. at 180 ("[T]he Speech or Debate Clause extends at least so far as to prevent [conspiring to give a speech in the House in exchange for remuneration] from being made the basis of a criminal charge against

making, publishing, presenting, and using legislative reports;[17] authorizing investigations and issuing subpoenas;[18] and holding

---

a member of Congress . . ..").  This, of course, is obvious from the text of the Speech or Debate Clause.  U.S. CONST. art I, § 6.

[15] *See Kilbourn*, 103 U.S. at 204 (protecting "resolutions offered"); *see also Brewster*, 408 U.S. at 526 (protecting "anything [a Member] did in the chamber or in committee"); *Tenney*, 341 U.S. at 374 (protecting "every other act resulting from the nature, and in the execution, of the office") (quoting *Coffin*, 4 Mass. (1 Tyng) at 27).

[16] *See Brewster*, 408 U.S. at 526 (protecting "how [a Member] voted"); *Tenney*, 341 U.S. at 374 (protecting "the giving of a vote") (quoting *Coffin*, 4 Mass. (1 Tyng) at 27); *Kilbourn*, 103 U.S. at 204 (protecting "the act of voting, whether it is done vocally or by passing between the tellers").

[17] *See McMillan*, 412 U.S. at 312 ("[A] published report may, without losing Speech or Debate Clause protection, be distributed to and used for legislative purposes by Members of Congress, congressional committees, and institutional or individual legislative functionaries."); *id.* at 313 (protecting "preparing a report where [the challenged materials] were reproduced, and authorizing the publication and distribution of that report"); *Tenney*, 341 U.S. at 374 (protecting "the making of a written report"); *Kilbourn*, 103 U.S. at 204 (protecting "written reports presented in [the legislative] body by its committees").

[18] *See U.S. Servicemen's Fund*, 421 U.S. at 504 ("The power to investigate and to do so through compulsory process plainly falls within [the definition of legislative activity]."); *id.* ("Issuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate."); *McMillan*, 412 U.S. at 313 (protecting the "act[] of authorizing an investigation pursuant to which the subject materials were gathered"); *Tenney*, 341 U.S. at 377 ("Investigations, whether by standing or special committees, are an established part of representative government.").

hearings and "introducing material at Committee hearings."[19] Many personnel decisions by Members' personal offices lack even "some nexus," *Brewster*, 408 U.S. at 528, to these types of legislative acts. Firing an aide for falsifying expense reports, or disciplining an assistant for harassing others in the office is "not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator." *Brewster*, 408 U.S. at 526.

*Browning* nevertheless held that the Speech or Debate Clause protects those personnel decisions taken with respect to employees whose duties are "directly related to the due functioning of the legislative process." *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923, 929 (D.C. Cir. 1986) (emphasis removed). We now see that an employee's duties are too crude a proxy for protected activity. Our holding in *Browning* presumes that a personnel decision with regard to an employee whose duties are "directly related to the due functioning of the legislative process," *Browning*, 789 F.2d at 929 (emphasis removed), is always "an integral part of the deliberative and communicative processes," *Gravel*, 408 U.S. at 625. But the presumption is, at a minimum, overinclusive and therefore inconsistent with the Court's practice of being "careful not to extend the scope of the protection further than its purposes require." *Forrester v. White*, 484 U.S. 219, 224 (1988). Any number of counter-examples reveal as much: a legislative aide may be discharged because of budgetary

---

[19] *McMillan*, 412 U.S. at 312 ("[I]t is plain to us that the complaint in this case was barred by the Speech or Debate Clause insofar as it sought relief . . . for introducing material at Committee hearings . . ., for referring the Report that included the material to the Speaker of the House, and for voting for publication of the report."); *id.* at 313 (protecting the act of "holding hearings where the [challenged] materials were presented").

cutbacks; a staff member may be demoted solely for consistent tardiness; a person seeking a top-level staff position might be rejected for having a poor college transcript; and so forth. That the person targeted by the personnel decision performs duties "directly related to . . . the legislative process," *Browning*, 789 F.2d at 929 (emphasis removed), is not enough – conduct must be "part of," not merely "related to," the "due functioning" of the "legislative process" to be protected by the Speech or Debate Clause, *Brewster*, 408 U.S. at 514. At best, that an employee's duties are directly related to the legislative process establishes merely "some nexus" between the personnel decision and that process. *Brewster*, 408 U.S. at 528; *see Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995). We therefore reject *Browning*'s test for determining when a legislator's personnel decision is protected by the Speech or Debate Clause.

The Office of Senator Dayton defends *Browning* on the ground that "[d]irecting one's alter egos" – that is, legislative aides with duties directly related to the legislative process, *see Gravel*, 408 U.S. at 616-17 – necessarily "is an integral part of the processes of achieving one's legislative goals," because of the duties such employees perform. Br. for Appellant Office of Senator Dayton 20. We see several problems with this formulation. The Speech or Debate Clause protects conduct that is integral to the legislative *process*, not a Member's legislative *goals*. It may be integral to a Member's legislative goals – indeed, integral even to accomplishing his "constitutionally delegated duties," *id.* – to send newsletters to constituents or deliver speeches outside of Congress to generate support for prospective legislation. But such acts are "political," not "legislative," and therefore not protected by the Speech or Debate Clause. *Brewster*, 408 U.S. at 512; *see Proxmire*, 443 U.S. at 131. Another problem with the formulation lies in its assumption that a Member only directs his alter egos with regard

to constitutionally protected activities. "That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature." *Gravel*, 408 U.S. at 625. Legislative aides are no different.[20]

The Office of Senator Dayton also relies on *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) – the presidential immunity case – to defend *Browning*. In *Fitzgerald*, the Supreme Court relied on separation of powers principles to grant the President "absolute . . . immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756. It is true that both legislative and presidential immunity are animated by separation of powers principles. But this does not mean that the immunities are coextensive. The President's immunity is based on his "unique position in the constitutional scheme," *id.* at 749, and the "singular importance of the President's duties," *id.* at 751. The Court therefore approaches presidential immunity differently. *Id.* at 749; *see Forrester*, 484 U.S. at 224-25; *Bastien*, 390 F.3d at 1317. Legislative immunity under the Speech or Debate Clause is limited to matters that are part of, or integral to, the due functioning of the legislative process. It is not enough that a Member's conduct is within the

---

[20] We have recognized that a "Member's ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006). While there is no doubt a "clear nexus" between a personnel decision involving an employee with legislative duties and the Member's "ability to carry out his representative responsibilities effectively," *id.* at 665-66, a "nexus" alone is insufficient to trigger the protections of the Speech or Debate Clause, *Brewster*, 408 U.S. at 528.

outer perimeter of the legislative process. *Cf. Brewster*, 408 U.S. at 513-16, 528.[21]

B.

Without *Browning*, we are left with the question how the district court should evaluate the Member Offices' claims to Speech or Debate Clause immunity in these suits.

The Speech or Debate Clause operates as a jurisdictional bar when "the actions upon which [a plaintiff] sought to predicate liability were 'legislative acts.'" *McMillan*, 412 U.S. at 318 (quoting *Gravel*, 408 U.S. at 618). To determine on what actions a plaintiff sought to predicate liability, we examine the pleadings. *See id.* at 312 (finding it "plain . . . that the complaint in this case was barred by the Speech or Debate Clause insofar as it sought relief" for conduct protected by the Clause); *Tenney*, 341 U.S. at 376 (inquiring "whether from the pleadings it appears that the [legislators] were acting in the sphere of legitimate legislative activity."); *see also Brewster*, 408 U.S. at 525 (examining the face of the indictment to determine whether "inquiry into legislative acts or motivation for legislative acts is necessary . . . to make out a prima facie case"). In these cases, it does not appear from Fields's or Hanson's complaints that either sought to predicate liability on protected conduct. Fields alleges that the Office of Representative Johnson discriminated against her because of her race and gender and retaliated against

---

[21] There are other differences. Presidential immunity, for instance, "does not extend indiscriminately to the President's personal aides or to Cabinet level officers," *Forrester*, 484 U.S. at 225 (citations omitted), while Speech or Debate Clause immunity may be invoked by a Member's "aides insofar as the[ir] conduct . . . would be a protected legislative act if performed by the Member himself," *Gravel*, 408 U.S. at 618.

her when she objected to discriminatory treatment of her co-worker, Elisabeth Howie, and when she filed a complaint with the Office of Compliance.  Hanson alleges that Senator Dayton himself discriminated against him because of his heart condition and that the Office of Senator Dayton denied him deserved overtime compensation.  In neither case is it "necessary to inquire into how [the Member] spoke, how he debated, how he voted, or anything he did in the chamber or in committee in order to make out a violation" of the Accountability Act.  *Brewster*, 408 U.S. at 526; *compare Bastien*, 390 F.3d at 1315-16.[22]

---

[22] Because the complaints are not predicated on legislative acts, Judge Brown's concurrence is mistaken in thinking it necessary to decide whether the defendant – that is, the personal office of the Member – is equivalent to the Member for the purpose of invoking the jurisdictional bar of the Speech or Debate Clause.  To prove the lack of equivalency in the abstract – which misapplies the law for the reasons Judge Tatel gives in his separate opinion – Judge Brown writes that "nothing in the Act suggests that the member can make final litigation decisions on behalf of the employing office."  Op. of Judge Brown 15.  This is not only irrelevant but impossible.  Litigation decisions are made by the client, on the advice of counsel.  The attorney representing the Member's office is not a free agent.  His client is the personal office of the Member, which consists of the Member and his staff.  Who is in charge of the office and who makes the decisions for the office?  The Member of course.

Judge Brown argues that a Member's personal office cannot invoke the Clause on the Member's behalf because it "is not a person, nor a sovereign government, nor a branch of government, nor an agency created by statute, nor a chartered corporation, nor a trust, nor a partnership."  Op. of Judge Brown 12.  The same could be said of congressional committees, which fall within the Accountability Act's definition of "employing office."  2 U.S.C. § 1301(9).  Yet the Supreme Court has held that legislative committees may invoke the Clause. *See Tenney*, 341 U.S. at 379.  Precedent in this circuit is to the

22

But the fact that Fields and Hanson are able to plead prima facie cases under the Accountability Act without violating the Speech or Debate Clause does not mean the Speech or Debate Clause in no way hinders their suits. When the Clause does not preclude suit altogether, it still "protect[s] Members from inquiry into legislative acts or the motivation for actual performance of legislative acts." *Brewster*, 408 U.S. at 508; *Brown & Williamson*, 62 F.3d at 415 n.5 ("Even when properly subject to suit, members of Congress are privileged against the evidentiary use against them of any legislative act, even if the act is not claimed to be itself illegal, but is offered only to show motive . . .." (citing *Helstoski*, 442 U.S. at 487-89; *Brewster*, 408 U.S. at 527; *Johnson*, 383 U.S. at 169)). This evidentiary privilege includes a "testimonial privilege." *Brown & Williamson*, 62 F.3d at 418. A Member "may not be made to answer" questions – in a deposition, on the witness stand, and so forth – regarding legislative activities. *Gravel*, 408 U.S. at 616; *see Brown & Williamson*, 62 F.3d at 418-21. "Revealing

---

same effect. *See Consumers Union v. Periodical Correspondents Ass'n*, 515 F.2d 1341 (D.C. Cir. 1975). Judge Brown cannot square her position with *Tenney*, which the Supreme Court treats as a Speech or Debate Clause case, *Powell*, 395 U.S. at 501, or with *Consumers Union*.

Judge Brown also thinks it significant that "an employee in the personal office of a member is in truth an employee of *Congress*" because salary payments are administered centrally by the Secretary of the Senate and the Chief Administrative Officer of the House of Representatives. *See* Op. of Judge Brown 12-13. That is also true of legislative aides, who are able to invoke the Clause in certain circumstances, *see Gravel*, 408 U.S. at 621-22 – indeed it is true even of Members. These matters, as well as the exceedingly odd idea that a Member's staffing decisions are made "on behalf of Congress" rather than the Member, Op. of Judge Brown 12, simply have no bearing on the issues before us.

information as to a legislative act . . . to a jury" – whether by testimony or other evidence – "would subject a Member to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of the Speech or Debate Clause." *Helstoski*, 442 U.S. at 490.

Thus, even if the challenged personnel decisions are not legislative acts, inquiry into the motivation for those decisions may require inquiry into legislative acts. For example, interactions with legislative staff (which may form part of the basis for personnel actions) are often part of the due functioning of the legislative process. The Supreme Court recognized this in *Gravel* when it approved an order that, among other things, "forbade questioning any witness including [a congressional aide] . . . concerning communications between the Senator and his aides during the term of their employment and related to [a particular] meeting or any other legislative act of the Senator." *Gravel*, 408 U.S. at 628-29 (footnote omitted). The Speech or Debate Clause therefore may preclude some relevant evidence in suits under the Accountability Act.[23]

Most of the claims in these suits allege discrimination and, absent direct evidence of discrimination, are subject to the framework established by *McDonnell Douglas Corp. v. Green*,

---

[23] Judge Brown's concurrence states that "there is little reason to believe that allowing these suits to proceed will threaten legislative independence or unduly involve the judicial branch in the affairs of the legislative branch." Op. of Judge Brown 16. This speculation has no basis in reality. The Accountability Act authorizes suits based on conduct occurring in a Member's personal office, *see* 2 U.S.C. § 1408(b), which necessarily calls into question the actions of Members or their aides.

411 U.S. 792 (1973).[24] That framework – under which a plaintiff proves a prima facie case of discrimination, which the employer rebuts by producing evidence that its conduct was nondiscriminatory, which the plaintiff then seeks to demonstrate is pretextual, *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-56 (1981) – presents special problems in the context of the Speech or Debate Clause.[25] Liability for

---

[24] Fields alleges racial and gender discrimination in violation of 2 U.S.C. § 1311, which incorporates § 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, to which the *McDonnell Douglas* framework applies, *see McDonnell Douglas Corp.*, 411 U.S. at 802. She also alleges retaliation under 2 U.S.C. § 1317(a), to which the *McDonnell Douglas* framework presumably applies. *See Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006). Hanson alleges disability discrimination in violation of 2 U.S.C. § 1311(a)(3), which incorporates § 501 of the Rehabilitation Act, 29 U.S.C. § 791, and §§ 102-104 of the Americans with Disabilities Act, 42 U.S.C. §§ 12112-12114, both of which are subject to the *McDonnell Douglas* framework. *See Barth v. Gelb*, 2 F.3d 1180, 1185-86 (D.C. Cir. 1993) (Rehabilitation Act); *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc) (Disabilities Act).

[25] Not all of the claims in the complaints allege discrimination. Fields and Hanson both allege violations of 2 U.S.C. § 1313, which incorporates certain provisions of the Fair Labor Standards Act, but to which the *McDonnell Douglas* framework does not apply. *See, e.g.*, *Thompson v. Sawyer*, 678 F.2d 257, 270-71 (D.C. Cir. 1982) (discussing equal pay discrimination in violation of 29 U.S.C. § 206(d)); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946) (discussing burden allocation in suits seeking overtime compensation under the Fair Labor Standards Act). (Hanson also alleges a nondescript violation of 2 U.S.C. § 1312, which incorporates §§ 101-105 of the Family and Medical Leave Act, 29 U.S.C. §§ 2611-2615, but the complaint does not give sufficient detail to know whether the *McDonnell Douglas* framework will apply to this claim.) Nondiscrimination claims such as these, which may give rise to

discriminatory personnel decisions rests not on the fact that action was taken ("you can't *fire* me"), nor on the duties of the employee against whom action was taken ("you can't fire the chief of staff"), but on the reason that action was taken ("you can't fire me *for that reason*"). But what happens when the action was motivated by the employee's participation in the legislative process?

Suppose a plaintiff sues a Member's personal office claiming her discharge violated the Accountability Act. Suppose further that she is able to make out a prima facie case of discrimination of one form or another. If the employing office produces evidence – by affidavit, for example – that the personnel decision was made because of the plaintiff's poor performance of conduct that is an integral part of "the due functioning of the [legislative] process," *Brewster*, 408 U.S. at 516 (emphasis removed), then for the plaintiff to carry her burden of persuasion, she must "demonstrate that the proffered reason was not the true reason for the employment decision," *Burdine*, 450 U.S. at 256; *see also Smith v. District of Columbia*, 430 F.3d 450, 455-56 (D.C. Cir. 2005); *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005). In many cases, the plaintiff would be unable to do so without "draw[ing] in question" the legislative activities and the motivations for those activities asserted by the affiant – matters into which the Speech or Debate Clause prohibits judicial inquiry. *Brewster*, 408 U.S. at 526 (quoting *Johnson*, 383 U.S. at 185); *see also Helstoski*, 442 U.S. at 490. For example, if a Senator claimed to have fired an employee because speeches the employee wrote did not accurately reflect the Senator's legislative objectives, the Speech or Debate Clause would preclude the employee from proving her case by demonstrating that the speeches she wrote did in fact

---

liability regardless of the employer's motivation, are unlikely to present the problems discussed above.

accurately reflect the Senator's legislative objectives. In such a case, if the evidence ultimately bore out the affiant's account of the plaintiff's discharge, then the very inquiry leading to that conclusion would be unconstitutional. *See Helstoski*, 442 U.S. at 489 ("The Clause protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.' . . . [R]eferences to past legislative acts of a Member cannot be admitted without undermining the values protected by the Clause." (quoting *Brewster*, 408 U.S. at 525)).

In employment discrimination cases under the Accountability Act, then, as in any other employment discrimination case, the defendant will provide evidence of a legitimate nondiscriminatory reason for the discharge. To invoke the Speech or Debate Clause, the employing office should include with this evidence an affidavit from an individual eligible to invoke the Speech or Debate Clause recounting facts sufficient to show that the challenged personnel decision was taken because of the plaintiff's performance of conduct protected by the Speech or Debate Clause. The affiant must have personal knowledge of the facts underlying his averment and otherwise must be able to assert a Member's Speech or Debate Clause immunity. *See Gravel*, 408 U.S. at 618; *see also id.* 622 n.13 ("[A]n aide's claim of privilege can be repudiated and thus waived by the Senator.").[26] The affidavit must indicate into what "legislative activity" or into what matter integral to the due functioning of the legislative process the plaintiff's suit necessarily will inquire.

---

[26] A plaintiff therefore may challenge a defendant's eligibility to invoke the Speech or Debate Clause by arguing that the predicates for doing so under *Gravel* are not satisfied.

With that submission, the district court must then determine whether the asserted activity is in fact protected by the Speech or Debate Clause. If it is, the action most likely must be dismissed, as the failure to rebut a defendant's evidence with "evidence . . . that the[] proffered justifications were mere pretext" normally is fatal to a plaintiff's discrimination allegations. *Smith*, 430 F.3d at 455-56. If the lawsuit does not inquire into legislative motives or question conduct part of or integral to the legislative process, or if the district court determines that the asserted activity is not in fact part of or integral to the legislative process, then the case can go forward. *Cf. Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360-61 (D.C. Cir. 1990) (noting, in a different context, that where inquiry into a matter was forbidden "even for the purpose of showing it to be pretextual," the claim need not be dismissed because "it may turn out that the potentially mischievous aspects . . . are not contested . . . or are subject to entirely neutral methods of proof" and "[o]nce evidence is offered, the district court will be in a position to control the case"). We need not decide today whether a case in which the plaintiff uses evidence unrelated to legislative acts – such as direct evidence of discrimination or evidence that at the time of discharge the Senator offered a different reason for the employment action from the one alleged in the affidavit – to demonstrate that the defendant's legislative explanation is pretext requires more questioning of the defendant's legislative motives than the Speech or Debate Clause allows. We merely note that a plaintiff who seeks to prevail by quarreling with the defendant's statements about activity protected by the Speech or Debate Clause must fail.

We recognize that in operating this way the Clause effectively may preclude a plaintiff's discrimination suit. But this does not deprive the Accountability Act of all force, as Fields and Hanson suggest. Just as "a Member of Congress may

be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts," *Brewster*, 408 U.S. at 512, so too a Member's personal office may be liable under the Accountability Act for misconduct provided that the plaintiff can prove his case without inquiring into "legislative acts or the motivation for legislative acts," *id.* And a plaintiff whose suit cannot proceed in federal court by operation of the Speech or Debate Clause still may avail himself of the Accountability Act's administrative complaint procedure. *See* 2 U.S.C. § 1405.

Accordingly, we now reject the *Browning* framework and affirm the judgments below because the Speech or Debate Clause does not bar jurisdiction in these cases.

*Affirmed.*

ROGERS, J., *concurring in part and in the judgment*: For reasons stated in the opinions of Judge Randolph and Judge Brown, I agree that the employee-duties test of *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923 (D.C. Cir. 1986), is overbroad and must be rejected. *See* Op. of Judge Randolph 17-20; Op. of Judge Brown 9-10.

I also agree that the Speech or Debate Clause does not pose a jurisdictional bar to Fields' and Hanson's lawsuits under the Congressional Accountability Act ("CAA"). Neither the history of the Clause nor Supreme Court precedent provides a basis on which to conclude that personnel decisions are "legislative acts" because, even when motivated by legislative considerations, the personnel decisions themselves are not "an integral part of the deliberative and communicative processes by which Members participate in [congressional] proceedings." *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see Bastien v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1315 (10th Cir. 2004); *cf. Forrester v. White*, 484 U.S. 219, 229 (1988). Further, consistent with Supreme Court jurisprudence indicating the court should examine the pleadings to determine "whether it is necessary to inquire into how [the Member] spoke, how he debated, how he voted, or anything he did in the chamber or in committee in order to make out a violation of this statute," *United States v. Brewster*, 408 U.S. 501, 526 (1972), an examination of the complaints makes clear that neither plaintiff must rely on legislative acts to make a *prima facie* case. *See* Op. of Judge Randolph 20-21.

I further agree that the Clause's evidentiary privilege, *see, e.g., United States v. Helstoski*, 442 U.S. 477, 487-90 (1979), has a role to play. *See* Op. of Judge Randolph 22-

23; Op. of Judge Brown 19; Op. of Judge Tatel 3. Defining that role presents potentially difficult questions, particularly as the Supreme Court has yet to speak to the question in this context, and its statements in other contexts can be understood to point in different directions, as the opinions of Judge Randolph and Judge Brown reflect. *Compare* Op. of Judge Randolph 25-26 (citing *Helstoski*, 442 U.S. at 489-90), *with* Op. of Judge Brown 20-21 (citing *Gravel*, 408 U.S. at 629 n.18).

For the reasons stated in Judge Brown's opinion, it is tempting to interpret the unique statutory scheme created by Congress in the CAA in a manner that allows discrimination and other claims to proceed against the Member's personal office largely unfettered by the protections afforded by the Speech or Debate Clause when Members or their alter egos are personally sued, *see* Op. of Judge Brown 11-17, 21; *see also* Op. of Judge Tatel 4. But Supreme Court jurisprudence has yet to so limit the reach of the Clause. *See* Op. of Judge Randolph 12-13 (citing cases); Op. of Judge Tatel 4. Nevertheless, it is not self-evident that the Clause's safeguards of legislative independence would be threatened by an approach that permitted CAA suits such as those before us to proceed subject only to protection of evidence of legislative acts produced by Members and their alter egos upon proper invocation of the privilege.

Because these are appeals of denials of motions to dismiss under Federal Rule of Civil Procedure 12(b)(1), the court need not address what happens when legislative acts arise as potential evidence in varying contexts in CAA litigation. It is unclear whether or precisely how these questions may arise upon the remand of the cases on appeal. The court would benefit from briefing based on the

application of the evidentiary privilege by the district court in a particular context. Attempts to signal the answers to such questions are fraught with problems. Hence, I would leave open the question of how the Clause may limit evidence offered by parties in CAA litigation and whether the role of the Member's personal office as the defendant under the CAA affects the application of the Clause.

Accordingly, I join Judge Randolph's opinion to the extent it is consistent with the views I have expressed.

TATEL, *Circuit Judge, concurring*: Though disappointed at our failure to reach consensus in this important case, I take some solace from the fact that the commonalities of our opinions exceed their differences—differences that relate to questions more easily answered after further factual development. I write separately to point out the commonalities, to briefly discuss the differences, and to suggest how the cases should proceed on remand.

First, the commonalities. All of us agree that *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 939 (D.C. Cir. 1986), extends further than the Speech or Debate Clause requires. *See* Op. of Judge Randolph 17; Op. of Judge Brown 10; Op. of Judge Rogers 1. All of us also agree, however, that the Speech or Debate Clause still has some role to play in employment discrimination cases, Op. of Judge Randolph 22; Op. of Judge Brown 19; Op. of Judge Rogers 1, and that the question of what precisely the Clause precludes is best resolved on a case-by-case basis, Op. of Judge Randolph 25-27; Op. of Judge Brown 21; Op. of Judge Rogers 2-3. And all of us agree that the two district court orders should be affirmed.

What, then, divides us? After dispensing with *Browning*, the two principal opinions diverge. Judge Randolph's opinion for the court holds that because neither of the cases before us rests on legislative acts, we have no basis for dismissing them. Judge Randolph then points out that the Speech or Debate Clause may preclude some evidence, that in many employment cases it may preclude the very evidence upon which plaintiffs seek to rely, and that if it does, the suit may not proceed. The principal concurrence focuses on whether the defendant functions as a Member's alter ego, arguing that wide variations in Speech or Debate Clause protection hinge on the answer to that question. This approach would apply one version of the Speech or Debate Clause if the defendant is a Member's alter ego and another if the defendant is not.

Not only do I find this distinction unworkable, but I do not understand what it means for a defendant to "be" a Member's alter ego. No one acts as a Member's alter ego all the time: even a Member's primary legislative aide does not act as the Member's alter ego when brushing her teeth. Whether an aide acted as a Member's alter ego turns on the particular *act* the aide performed on the Member's behalf. Reinforcing this point, *Gravel v. United States*, the first case to have used the term "alter ego," focuses on the aide's actions: "the Speech or Debate Clause applies not only to a Member but also to his aides insofar as the *conduct* of the latter would be a protected legislative act if performed by the Member himself." 408 U.S. 606, 618 (1972) (emphasis added); *see also id.* at 621-22 ("the privilege applicable to the aide [must be] viewed . . . as the privilege of the Senator, and invocable only by the Senator or by the aide on the Senator's behalf, and . . . in all events the privilege available to the aide is confined to those *services* that would be immune legislative *conduct* if performed by the Senator himself" (footnote omitted) (emphasis added)); *id.* at 622 (noting that an aide can testify "at trials or grand jury proceedings involving third-party crimes" only if "the questions do not require testimony about or impugn a legislative act").

Of course, the person who performed the challenged action and the defendant in the litigation are often the same person (e.g., if the aide faces criminal or civil liability), so it is a convenient shorthand to say that only an alter ego can exercise the privilege to preclude litigation about particular conduct. But that shorthand refers to whether the person acted as the Member's alter ego when performing the (possibly) legislative act at issue, not to whether the aide "is" an alter ego at the time of the litigation. Even language from *Gravel*, upon which the principal concurrence relies, comes from a section of the opinion emphasizing the conduct at issue

over the defendant's identity. The statement "relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act," *id.* at 621, *quoted in* Op. of Judge Brown 20, appears in a paragraph beginning "[n]one of these three cases [*Kilbourn v. Thompson*, 103 U.S. 168 (1881), *Dombrowski v. Eastland*, 387 U.S. 82 (1967), and *Powell v. McCormack*, 395 U.S. 486 (1969)] adopted the simple proposition that immunity was unavailable to congressional or committee employees because they were not Representatives or Senators; rather, immunity was unavailable because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection," *Gravel*, 408 U.S. at 620.

Focusing on particular actions rather than on the defendant's "status" as an alter ego suggests a simple rule: no Member or alter ego can be held liable for the performance of a legislative act. As Judge Randolph points out, however, these cases do not implicate that rule because neither Fields nor Hanson must prove the performance of a legislative act in order to prevail. Op. of Judge Randolph 20-21.

But the Speech or Debate Clause does not end there. We all agree that the Clause also precludes introduction of certain evidence and that this aspect of the privilege will come into play in these cases if a Member or an appropriate aide asserts it. *See id.* at 26 ("The affiant . . . must be able to assert a Member's Speech or Debate Clause immunity."); Op. of Judge Brown 21 ("[T]he Clause functions only as a testimonial and documentary privilege, to be asserted by members and qualified aides if they are called upon to produce evidence."). Still, we differ on how broad a role the Clause plays. The principal concurrence suggests that so long as aides are neither producing the evidence nor defending the case, litigation can center on the motivation for legislative

acts. *See* Op. of Judge Brown 20-22. According to Judge Randolph, the Speech or Debate Clause precludes litigation in which a plaintiff seeks to meet the *McDonnell Douglas* burden by challenging the veracity of an aide's testimony about the motivation for legislative acts. *See* Op. of Judge Randolph 23-27 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Because judicial assessment of the aide's testimony would constitute "inquiry into legislative acts or the motivation for actual performance of legislative acts," *United States v. Brewster*, 408 U.S. 501, 509 (1972), I agree with Judge Randolph.

To be sure, I might prefer a more limited view of the Speech or Debate Clause's reach were I writing on a blank slate, but several Supreme Court decisions make clear that we must tread carefully in this area. *See* Op. of Judge Randolph 12 (citing cases). Indeed, "[r]ather than giving the [Speech or Debate] Clause a cramped construction, the [Supreme] Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Gravel*, 408 U.S. at 618. For this reason, I believe we must leave it to the Supreme Court to narrow the Speech or Debate Clause's reach. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("[T]he Court of Appeals should . . . leav[e] to [the Supreme] Court the prerogative of overruling its own decisions.").

Thus, although I agree that suits against congressional offices—as authorized by the Congressional Accountability Act—place less pressure on Members than would suits against Members personally, I cannot agree that the Clause's protection extends only to cases in which Members (or their aides) are witnesses or defendants. Nor do I share the principal concurrence's confidence that CAA cases will not

"unduly involve the judicial branch in the affairs of the legislative branch." Op. of Judge Brown 16. Certainly the language from *Gravel* upon which the principal concurrence relies—"We do not intend to imply . . . that in no grand jury investigations or criminal trials of third parties may third-party witnesses be interrogated about legislative acts of Members of Congress," *Gravel*, 408 U.S. at 629 n.18, *quoted in* Op. of Judge Brown 20—stands for no such proposition; *Gravel* states only that *some* testimony about legislative acts by third-party witnesses *may* be admissible, not that *all* such testimony *is* admissible.

For these reasons, I join Judge Randolph's opinion. Still, I emphasize that despite our differences, we all agree that on remand the district courts must determine whether particular aspects of these two cases implicate Speech or Debate Clause concerns. In my view, the district courts should focus on determining whether the cases may proceed without undue judicial "inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *Brewster*, 408 U.S. at 525. Because such determinations will necessarily be fact-bound, it is appropriate that we announce no blanket rule today. Once the district courts develop the factual records, the issues that divide this court may become clearer.

BROWN, *Circuit Judge, with whom* SENTELLE *and* GRIFFITH*, Circuit Judges, join, concurring in the judgment*: The Congressional Accountability Act of 1995 (the "Act"), 2 U.S.C. §§ 1301-1438, was the first legislation of the 104th Congress, adopted in the Senate by a vote of 98 to 1, and adopted unanimously in the House. Section 102(a) of the Act lists several federal laws that "shall apply . . . to the legislative branch of the Federal Government," including (1) the Fair Labor Standards Act of 1938, (2) Title VII of the Civil Rights Act of 1964, (3) the Americans with Disabilities Act of 1990, (4) the Age Discrimination in Employment Act of 1967, (5) the Family and Medical Leave Act of 1993, and (6) the Occupational Safety and Health Act of 1970. 2 U.S.C. § 1302(a). President Clinton described the Act as "a reform that requires Congress to live under the laws it imposes on the American people," commenting that "Washington has too often isolated itself from the every day experience of ordinary Americans." Remarks on Signing the Congressional Accountability Act of 1995, 31 Weekly Comp. Pres. Doc. 91, 91 (Jan. 22, 1995). In these cases, we address whether, and in what circumstances, the defendant in an action brought pursuant to the Act may assert the Speech or Debate Clause as a jurisdictional bar, thereby requiring summary dismissal of the action.

Our determination of this issue calls into question the framework we articulated in *Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984), and *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923 (D.C. Cir. 1986), concerning applicability of the Speech or Debate Clause in employment litigation involving congressional employees. I conclude that the rule stated in those cases distorts the Speech or Debate Clause beyond its natural contours, and therefore I, too, would repudiate it and refocus our analysis on the terms of the Constitution and the relevant statements of the Supreme Court, but I would approach the case in a somewhat different way than Judge Randolph.

2

I

A

*Fields v. Office of Eddie Bernice Johnson, Employing Office, United States Congress*, No. 04-5315: From January 2002 until March 2004, Beverly Fields was the chief of staff in the congressional office of Eddie Bernice Johnson, a member of the United States House of Representatives. On June 3, 2004, Fields brought an employment discrimination action under the Act, naming the "Office of Eddie Bernice Johnson" as the defendant as section 408 of the Act requires. *See* 2 U.S.C. § 1408. In her amended complaint, Fields claims the office actively sought an Asian person under the age of forty to replace a dark-skinned Latino employee. When the office selected a suitable Asian employee, it terminated the Latino employee, giving the employee only one day's notice. Fields objected and asked the office to allow the Latino employee to continue working for two more months, but the office allegedly rejected this request. About the same time, according to the complaint, the office began efforts to replace Fields, who is African American, with a white man. To that end, the office allegedly made false accusations against Fields regarding her job performance and her relationships with coworkers and then demoted Fields by taking away her supervisory responsibilities. Fields claims the demotion was based on her race and gender and that it was also in retaliation for her having intervened on behalf of the Latino employee. In addition, Fields alleges discrimination in regards to pay. Finally, Fields claims the office initiated a bad faith investigation of her conduct as an employee, seeking thereby to force her to resign, and when Fields refused to resign, the office allegedly terminated her. Fields claims the investigation and subsequent termination were retaliatory.

The office moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), claiming lack of jurisdiction based on the Speech or Debate Clause. According to a declaration filed by the office, Fields was integrally involved in executing Johnson's legislative agenda. Though many of her duties were administrative, Fields was also involved in formulating legislative strategy, advising Johnson on how to vote, approving Johnson's floor statements, drafting legislation, and conferring with staff of other legislative offices about various legislative initiatives.

On August 25, 2004, the district court denied the motion to dismiss in a two-line order, which stated no reasons, and on August 27, 2004, the office filed this interlocutory appeal.

B

*Hanson v. Office of Senator Mark Dayton*, No. 04-5335: From January 2001 until September 2002, Brad Hanson held various positions in the congressional office of Mark Dayton, a member of the United States Senate. Throughout this time, Hanson was located in Fort Snelling, Minnesota. On May 29, 2003, Hanson brought an employment discrimination action under the Act, naming the "Office of Senator Mark Dayton" as the defendant. *See* 2 U.S.C. § 1408. In his complaint, Hanson claims he was hired as a "State Office Manager." His job allegedly involved setting up three local offices in Minnesota and overseeing a "Health Care Help Line," which assisted people with their healthcare coverage problems. He alleges he worked considerable overtime, for which he was not paid. In 2002, according to the complaint, Hanson developed a medical condition that required surgery and a few weeks' recovery time. Hanson claims he met with Dayton on July 3, 2002, to tell Dayton of his need for this surgery. Five minutes into the meeting, Dayton allegedly said, "You're done," and he told Hanson he should no longer

report to the office and should instead go on immediate medical leave. On July 17, 2002, a senior staff member allegedly called Hanson at home and told him he would be terminated as of September 30, 2002. The complaint alleges Dayton fired Hanson because Hanson needed time off to recover from surgery, in violation of the Family and Medical Leave Act of 1993, and also because Dayton erroneously perceived Hanson to be disabled, in violation of the Americans with Disabilities Act of 1990. The complaint further alleges that the failure to compensate Hanson for overtime violated the Fair Labor Standards Act of 1938.

The office moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), claiming lack of jurisdiction based on the Speech or Debate Clause. According to a declaration filed by the office, Hanson's work included meeting with constituents, briefing the Senator on constituent concerns regarding healthcare and law enforcement, overseeing the "Health Care Help Line," and identifying possible legislative initiatives. The declaration asserts that Hanson's work enabled him to identify a problem regarding reimbursements to ambulance service providers, and it claims Hanson was part of a team that investigated this problem and advised Dayton, proposing legislative solutions. As a result of this advice, Dayton introduced a bill entitled the Medicare Ambulance Payment Reform Act of 2001, and Dayton also initiated a committee hearing to address this issue. The declaration states that Hanson helped plan the committee hearing, selected topics and witnesses, and developed questions for Dayton to ask at the hearing.

Hanson responded to this declaration with his own declaration stating that the office "exaggerates my role in legislation" and "[o]verall, I estimate that I did not spend more than five percent of my time on the type of legislative duties described in Senator Dayton's motion."

On September 7, 2004, the district court denied the motion to dismiss in a minute order, which stated no reasons, and on September 21, 2004, the office filed this interlocutory appeal.

C

In most circumstances, our jurisdiction to hear appeals from district court orders only extends to "final decisions." 28 U.S.C. § 1291. Under the collateral order doctrine, we also have jurisdiction to hear immediate appeals of certain interlocutory orders, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), namely those orders that "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment," *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). Such orders must "present[] a serious and unsettled question" to be immediately appealable. *Cohen*, 337 U.S. at 547. "[T]he denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). This framework applies to claims of immunity under the Speech or Debate Clause. *See, e.g., Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Because we have not yet had occasion to determine whether the personal offices of members of Congress may assert the protections of the Speech or Debate Clause, these cases present "serious and unsettled" questions arising out of "substantial" claims of absolute immunity. We therefore have jurisdiction to consider these appeals under the collateral order doctrine.

6

II

The Constitution provides: "[F]or any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The historical record does not indicate any debate or controversy with respect to this provision. Very similar provisions appear in the Articles of Confederation and the English Bill of Rights of 1689. The Clause has its roots in centuries of struggle between the English Parliament and the Crown—struggle that sometimes erupted in armed conflict, with both Parliament and the Crown commanding independent armies. In more than one instance, royal troops arrested or attempted to arrest members of Parliament in reaction to speeches made and actions taken in Parliament. Coming in response to these confrontations, the Bill of Rights of 1689 established a bedrock legal foundation for the freedom of ideas within Parliament. Nearly a hundred years later, the Speech or Debate Clause established the same principle in American government. As the Supreme Court has explained, "the purpose of the Speech or Debate Clause is . . . to preserve the independence and thereby the integrity of the legislative process." *United States v. Brewster*, 408 U.S. 501, 524 (1972).

> [T]he privilege was . . . born primarily of a desire . . . to prevent intimidation by the executive and accountability before a possibly hostile judiciary. . . . There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum . . . is the predominate thrust of the Speech or Debate Clause.

*United States v. Johnson*, 383 U.S. 169, 181-82 (1966).

The Supreme Court first interpreted the Speech or Debate Clause in *Kilbourn v. Thompson*, 103 U.S. 168 (1881). *Kilbourn* involved a false imprisonment claim based on the plaintiff's arrest by the Sergeant at Arms of the House of Representatives. *Id.* at 170. The Sergeant at Arms was acting pursuant to a contempt finding of the House, *id.* at 176-77, but the Supreme Court ruled the contempt finding improper, *id.* at 199-200. While the Court allowed the false imprisonment action against the Sergeant at Arms to proceed, it concluded that House *members* could claim immunity under the Speech or Debate Clause. *Id.* at 200-05. The Court adopted a principle of liberal construction as regards the Clause, extending its scope to legislative votes, reports, committee proceedings, and "'everything said or done . . . as a representative, in the exercise of the functions of that office.'" *Kilbourn*, 103 U.S. at 203 (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (1808)).

Though *Kilbourn* made clear that the reach of the Speech or Debate Clause extends beyond a literal reading of its terms, several later Supreme Court decisions have carefully circumscribed the scope of the clause, holding that it applies only to *core legislative acts*, not incidental or peripheral activities of congressional offices. For example, in *Brewster*, the Supreme Court concluded that the Speech or Debate Clause "prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts." 408 U.S. at 512. The Court rejected a rule that anything "in any way related" to the legislative process was privileged, *id.* at 516, and it listed a variety of "political" activities that are not privileged, such as "'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the

Congress," *id.* at 512. *See also Hutchinson v. Proxmire*, 443 U.S. 111, 131 (1979).

In *Gravel v. United States*, 408 U.S. 606 (1972), decided the same day as *Brewster*, the Supreme Court considered whether the clause protected the private publication of classified government documents. Senator Mike Gravel had placed the classified documents into the public record of a subcommittee meeting, but the Court concluded that a subsequent arrangement for private publication of the documents was not a protected legislative act. *Id.* at 625-26. The Court described the clause as covering only matters "integral [to] the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.* at 625. The Court then added that the protection "extend[s] . . . beyond pure speech or debate . . . , *but only when necessary to prevent indirect impairment of such deliberations.*" *Id.* (emphasis added, internal quotation marks and citation omitted). In other words, the Court's relatively broad formulation of the Clause's scope was cabined by the requirement that the Clause should only apply to the extent necessary to protect actual speech or debate.

Unlike the Supreme Court, we have interpreted the Speech or Debate Clause in the employment litigation context. In *Walker*, 733 F.2d at 934, we held that the Clause permitted a general manager of the House restaurant to sue for sex discrimination. In that case, we posited a distinction between "staff . . . who help prepare for hearings or assist in the composition of legislative measures" and those who provide "[a]uxiliary services attending to human needs," and we held that the latter group are not "'legislative' in character." *Id.* at 931. Judge MacKinnon concurred in part and dissented in part, arguing that

the Speech or Debate Clause immunizes members of Congress from liability with respect to all employment decisions so long as those decisions *are treated as legislative* by Congress itself. *Id.* at 938 (MacKinnon, J., concurring and dissenting). Judge MacKinnon expressly rejected the court's measurement of Congress's actions against "some Platonic ideal of the 'legislative' process," arguing that Congress itself defines what is a legitimate subject of legislative decisionmaking. *Id.* In this regard, Judge MacKinnon noted that the restaurant manager had been terminated on the authority of a vote taken by a congressional subcommittee. *Id.* at 941-43.

Two years later, in *Browning*, 789 F.2d 923, we held that the Speech or Debate Clause precluded any "judicial scrutiny" into the discharge of a House reporter whose job was to transcribe committee proceedings, *id.* at 924, and therefore it immunized Congress, its members, and their aides from liability, *id.* at 931. The court distinguished *Walker* on the ground that *Walker* involved an employee whose duties were not "directly related to the due functioning of the legislative process." *Id.* at 929 (emphasis omitted). The court articulated the following rule: "Where the duties of the employee implicate Speech or Debate Clause concerns, so will personnel actions respecting that employee." *Id.* at 928. Put another way, "[p]ersonnel decisions are an integral part of the legislative process to the same extent that the affected employee's duties are an integral part of the legislative process." *Id.* at 928-29.

The line we drew in *Walker* and *Browning*, focusing on the complaining employee's *duties*, has some superficial appeal; its glaring flaw, however, is that it lacks any basis in the Speech or Debate Clause. Moreover, by defining very broadly the type of duties that might constitute "an integral part of the legislative process"—even including within that definition a House reporter who lacked discretionary authority—we gave the immunity an

unduly expansive scope. A rule of decision that more closely reflects the language and purpose of the Speech or Debate Clause would need to focus on the subject matter of the employee's lawsuit and the evidence the parties would need to present to the court, because the complaining employee's duties are an imperfect metric for probing whether the lawsuit will in fact force the court to inquire into protected matters. For example, even if a complaining employee's duties are central to the legislative process, as in the case of an employee who drafts legislation and floor speeches, the employee's lawsuit may turn factually on a series of overt requests for sexual favors and crude remarks, and therefore it may have nothing to do with the member's legislative activities. In short, by focusing on the duties of the complaining employee, *Walker* and *Browning* established a much broader immunity than necessary to protect legislative independence, and nothing in the Speech or Debate Clause or the Supreme Court's precedents compelled this broad immunity. Therefore, like Judge Randolph, Op. of Judge Randolph 18, I also would repudiate the reasoning used in *Walker* and *Browning* and proceed to the issue before us without the constraint of the framework imposed by those precedents.

III

In enacting the Congressional Accountability Act, Congress in effect sidestepped *Browning*'s broad formulation of immunity by designating the "employing office," rather than the member, as the defendant. 2 U.S.C. §§ 1301(9), 1408(b). Nevertheless, appellants in the two cases before us argue that the "employing office" can invoke the Speech or Debate Clause on behalf of the member and thereby gain the benefit of the privilege. I reject this view.

First, it seems highly implausible, in light of Congress's unambiguous intention to open itself to liability under federal

employment laws, that Congress designated a defendant that could invoke the member's Speech or Debate Clause rights. Why would Congress go to the trouble of designating the employing office as the defendant merely to create a bureaucratic redundancy able to assert the same privileges as the member?

Second, the Supreme Court has determined that a member's aide is permitted to invoke the Clause on the member's behalf because the aide acts *as an alter ego of the member*, working under the member's authority and subject to his direction. *Gravel*, 408 U.S. at 616-18. The same cannot be said of the employing office. This second point requires us to analyze exactly what the "employing office" is. Unfortunately, the law is not as clear in this regard as it could be, but it is at least clear enough to say what the employing office is not; it is not an alter ego of the member.

The Act defines the "employing office" as

(A) the personal office of a Member of the House of Representatives or of a Senator; (B) a committee of the House of Representatives or the Senate or a joint committee; (C) any other office headed by a person with the final authority to appoint, hire, discharge, and set the terms, conditions, or privileges of the employment of an employee of the House of Representatives or the Senate; or (D) [various specifically named offices within the legislative branch].

2 U.S.C. § 1301(9). For purposes of the cases before us, an "employing office" is the personal office of a member.

The personal office of a member, however, is not an independent legal entity, nor does it have any independent

interests. It is not a person, nor a sovereign government, nor a branch of government, nor an agency created by statute, nor a chartered corporation, nor a trust, nor a partnership.[1] It is an organizational division within Congress, established for Congress's administrative convenience, analogous to a department within a large corporation. Therefore, an employee in the personal office of a member is in truth an employee of *Congress*, as to whom the member (acting on behalf of Congress) has supervisory control.

Title 2 of the United States Code is entitled "The Congress," and it deals generally with the administrative organization of Congress. Chapter 4 of Title 2, entitled "Officers and

---

[1] The same, of course, might be said of a congressional committee, which would also qualify as an "employing office" under 2 U.S.C. § 1301(9). We are not here presented with a case involving a congressional committee as a defendant, but a committee arguably has a stronger claim to independent legal existence than a member's personal office in that a committee is formally established for certain express purposes and carries out actions in its own name, whereas a personal office exists only as a shell defendant to be sued under the Act. According to Judge Randolph, "the Supreme Court has held that legislative committees may invoke the [Speech or Debate] Clause." Op. of Judge Randolph 21 n.22 (citing *Tenney v. Brandhove*, 341 U.S. 367, 379 (1951)). *Tenney* did not so hold. *Tenney* held that Congress did not intend 42 U.S.C. § 1983 to supplant common law principles of legislative independence by imposing possible civil liability on state legislative committees. *See* 341 U.S. at 376; *see also Supreme Court of Va. v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 732 (1980). Judge Randolph also relies on *Consumers Union of the United States, Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341 (D.C. Cir. 1975). *Consumers Union* did not even involve a legislative committee as a defendant. Rather, it involved a private association, *id.* at 1345, that—like a legislative aide—acted on behalf of members of Congress, *id.* at 1350.

Employees of Senate and House of Representatives," governs employment-related administrative issues. Nothing in chapter 4 suggests that employees in member offices are anything other than congressional employees, or that member offices are anything other than administrative divisions within the two Houses of Congress. It is certainly true that Congress has chosen to adopt an administrative structure that gives great independence to its members. For example, each member of the Senate has a budget for employee compensation, 2 U.S.C. § 61–1(d)(1)(A); within the limits of that budget, "Senators may fix the number and the rates of compensation of employees in their respective offices" and "[a] Senator may establish such titles for positions in his office as he may desire to designate, by written notification to the disbursing office of the Senate," *id.* § 61–1(d)(2). Nevertheless, salary payments to these employees are administered centrally by the Secretary of the Senate. *Id.* § 60c–1. Similarly, members of the House of Representatives are authorized to employ as many as 18 permanent employees, *id.* § 92(a), but again, salary payments are administered centrally by the Chief Administrative Officer of the House of Representatives, *id.* §§ 60d–1, 95–1.

Thus, Congress has delegated to its individual members discretion in hiring, firing, and managing employees in their personal offices, but it did not make each of those offices into an independent government agency, and the employees remain employees of Congress as a whole. Congress could certainly choose to structure its administrative affairs in a different manner and may decide that stricter branch-wide personnel policies are warranted in order to limit violations of the Act. In any case, its current supervisory structure does not imply that the personal offices of its members are anything other than convenient administrative divisions.

14

For this reason, if we are to be legally precise, we cannot speak in terms of the "office" of a member taking a particular personnel action, because the "office" of the member is not a legal person. If a member hires or fires a legislative aide, the member makes a decision on behalf of the Congress, exercising power Congress has delegated to the member. *Cf.* 2 U.S.C. § 1301(9)(C) (designating as an "employing office" "any other office headed by *a person with* the final authority" to make personnel decisions (emphasis added)). The *office* of the member only gains some sort of quasi-legal existence when a dispute rises to the level of a suit under the Act. Then, the complaining employee has no choice but to name the member's office as the defendant because that is precisely what the Act instructs the employee to do. *Id.* § 1408(b). In sum, the "employing office" exists as a *prescribed label* for the defendant in a lawsuit under the Act, and it has no prior existence as an independent entity that took any specific action against the employee.

Therefore, though Congress has expressly designated the employing office as the *name* of the defendant, the question remains: Who is the real defendant behind the name? The answer to that question is not a simple one, but what is simple is that the member is not the real defendant, nor is the real defendant an alter ego of the member. First, Congress intended to subject the *legislative branch* to liability for violation of federal employment laws, not to subject its members personally to such liability. *See id.* § 1302. Second, *Congress's* attorneys defend the action. *See id.* § 1408(d); *see also* James J. Brudney, *Congressional Accountability and Denial: Speech or Debate Clause and Conflict of Interest Challenges to Unionization of Congressional Employees*, 36 HARV. J. ON LEGIS. 1, 10 n.46 (1999). Third, *Congress's* Office of Compliance has final settlement authority. *See* 2 U.S.C. § 1414. Fourth, funds

appropriated to *Congress's* Office of Compliance pay any settlement or judgment. *See id.* §§ 1381(a), 1415(a).

Moreover, nothing in the Act suggests that the member can make final litigation decisions on behalf of the employing office. It is true that the Executive Director of the Office of Compliance only has authority to approve or reject settlements "entered into by the parties," *id.* § 1414, implying that the employing office separately *negotiates* the settlement. However, it is not clear that the employing office would be under the direction of the member in this regard, especially because the member arguably has a personal interest in the litigation that is at odds with that of the employing office. Furthermore, this provision at most gives the member, acting as Congress's agent, an active role in the litigation; it clearly leaves the Office of Compliance as the final decisionmaker. It is also true that the Office of Compliance is to some extent an independent office within the legislative branch, subject to limited congressional oversight, *id.* § 1381, but if the Office of Compliance is not directly within Congress's control, it is certainly not within the *member's* control.

In short, the "employing office" is nothing like a member's aide, who can invoke the Speech or Debate Clause privilege on the member's behalf. Rather, by way of the Act, Congress sought to subject the legislative branch *as an institution* to federal employment laws. *Id.* § 1302(a). *Cf. Bastien v. Office of Senator Ben Nighthorse Campbell*, No. 01-cv-799, 2005 WL 3334359, at *4 (D. Colo. Dec. 5, 2005) ("[T]he term 'employing office' actually refers to Congress and Congress is the responsible entity under the CAA."), *quoted in* --- F.3d ----, 2006 WL 1756043, at *1 (10th Cir. June 28, 2006). Even if it is not quite apt to describe the "employing office" as an alter ego of Congress, it is far less appropriate to describe it as an alter ego

of the member.[2] Most accurately put, the "employing office" is an administrative division within Congress, designated to be named as the defendant in these actions. Nothing in that status suggests that an employing office can invoke a member's Speech or Debate Clause rights.

In addition, because the defendant in these suits is so differently situated than a member's aide, there is little reason to believe that allowing these suits to proceed will threaten legislative independence or unduly involve the judicial branch in the affairs of the legislative branch. Of course, the precise rationale of the Supreme Court in *Gravel*—that aides must be treated as members' alter egos because "the day-to-day work of such aides is so critical to the Members' performance," *Gravel*, 408 U.S. at 616-17—does not apply here because, under the Act, the employing office serves no role in a member's daily legislative work, functioning only as a defendant in employment suits. Nevertheless, *Gravel* also requires the court to extend Speech or Debate Clause protection if failing to do so "will inevitably . . . diminish[] and frustrate[]" the Clause's purpose of "prevent[ing] intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," *id.* at 617, or if "judicial oversight . . . realistically threatens to control [a member's] conduct as a legislator," *id.* at 618. I do not believe,

---

[2] Judge Tatel contends that "[w]hether an aide acted as a Member's alter ago turns on the particular *act* the aide performed on the Member's behalf." Op. of Judge Tatel 2. Statutorily, a member's personal office only exists as a defendant to be sued under the Act. As the office is not an entity—actual or juridical—that can take actions, *a fortiori* it cannot act on behalf of the member; it is therefore precluded from qualifying as an alter ego of the member. Given that conclusion, I see no need to determine whether particular acts alleged in the complaint were "legislative," as those acts were not performed by the office itself.

however, that the limited judicial oversight the Act permits will contravene these standards.

To begin, the pressures the Act places on the member are slight: The member bears no financial risk—either from a judgment or attorneys' fees. The member, through invocation of the evidentiary privilege, which I discuss below, can avoid distractions by refusing to testify or provide evidence regarding legislative acts. The member may face some embarrassment by having his or her personnel decisions placed under the micro-scope, but little more than he would due to any other publicity-generating event. The conduct at issue in these suits must be considered to be at or beyond the outer edge of what is "integral [to] the deliberative and communicative processes by which Members participate in committee and House [or Senate] proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.* at 625; *cf. Forrester v. White*, 484 U.S. 219, 229 (1988). Taken together, these considerations suggest that suits under the Act against the employing office do not "realistically threaten[] to control [a member's] conduct as a legislator." *Gravel*, 408 U.S. at 618.

Thus, I see no reason to conclude that the employing office in an action brought pursuant to the Act is entitled to invoke the Speech or Debate Clause, either on its own behalf or on behalf of a member. Clarifying this point is critical because it estab-lishes that appellants in these cases cannot assert the Clause as a jurisdictional bar, regardless of whether the actions are predicated on legislative acts, and it also impacts how the Clause applies as an evidentiary rule.

Under the Supreme Court's cases, the Speech or Debate Clause often operates as an immunity from suit—or, more

18

precisely, as a jurisdictional bar depriving courts of the power to hear the suit. In *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967), for example, the Court stated that, when the Speech or Debate Clause applies, members of Congress "should be protected not only from the consequences of litigation's results but *also from the burden of defending themselves*." *Id.* at 85 (emphasis added). Similarly, in *Gravel*, the Court said that members of Congress are "shielded by the Speech or Debate Clause both from liability for their illegal legislative act and from having to defend themselves with respect to it." 408 U.S. at 620. And, in *Doe v. McMillan*, 412 U.S. 306, 318 (1973), the Court stated that certain acts "may not serve as a predicate for a suit" against members and aides, requiring dismissal of the complaint. Appellants here hope to gain the benefit of this jurisdictional bar, but allowing the suits to proceed will not force the members of Congress to bear the burden of defending the suits, nor will it subject the members to civil or criminal liability that might undermine their independence as legislators. Because appellants are not members of Congress, or alter egos of members, and therefore have no Speech or Debate Clause protection, the jurisdictional bar is not applicable.[3]

---

[3] Because I conclude that members' offices cannot assert the protections of the Speech or Debate Clause, I do not reach the subsequent questions of whether the acts alleged in the complaints in these cases are "legislative" and the jurisdictional significance of that determination. *Cf.* Op. of Judge Randolph 20-21. However, if the defendants here could assert the Speech or Debate Clause, I believe the jurisdictional application of the clause might be broader than Judge Randolph suggests. For the purposes of the Speech or Debate Clause to be fulfilled, it arguably ought to bar as a jurisdictional matter not only lawsuits in which the complaints are predicated on legislative acts, but also suits that will inevitably necessitate an inquiry into such acts and motivations, even where such inquiry would arise due to an affirmative defense. *Cf. Davis v. Passman*, 442 U.S. 228, 235 n.11 (1979) ("*Defenses* based upon the Clause should thus ordinarily be

That conclusion does not, however, suggest the Clause can play no part in these actions. The Supreme Court has also articulated an *evidentiary* application of the Speech or Debate Clause for those cases not requiring dismissal of the complaint on jurisdictional grounds. In *Brewster*, 408 U.S. 501, the Court stated that "a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." *Id.* at 512. Applying this rule, the Court permitted a bribery prosecution of a member of the Senate to go forward, because the prosecution focused only on whether the member received compensation in exchange for a *promise* to vote a certain way, and not on how the member *actually* voted or why. *Id.* at 525-27. Hence, the Court concluded that no "inquiry into a legislative act or the motivation for a legislative act [is] necessary to a prosecution under this statute or this indictment." *Id.*

In *United States v. Helstoski*, 442 U.S. 477 (1979), the court made clear that the holding in *Brewster*—permitting criminal prosecutions that do not rely on proof of legislative acts or the motives for such acts—should be applied as an evidentiary rule governing proceedings at trial. *Helstoski* concerned a criminal prosecution of a former member of the House in relation to "allegations that aliens had paid money for the introduction of private bills which would suspend the application of the immigration laws so as to allow them to remain in this country." *Id.* at 479. The Supreme Court instructed the trial court to apply the Speech or Debate Clause as a rule of evidence: "[*Johnson*

---

given priority, since federal legislators should be *exempted from litigation* if their conduct is in fact protected by the Clause." (emphases added)). If, for example, a member is a named defendant in a state law tort action alleging wrongful termination, limiting the member to an evidentiary application of the Clause seems too restrictive.

and *Brewster*] leave no doubt that evidence of a legislative act of a Member may not be introduced by the Government in a prosecution . . . ." *Id.* at 487. "Nothing [however] in our opinion . . . prohibits excising references to legislative acts, so that the remainder of the evidence would be admissible." *Id.* at 488 n.7. "As to what restrictions the Clause places on the admission of evidence, . . . [the Court's] concern is whether there is mention of a legislative act." *Id.* at 490.

In *Gravel*, 408 U.S. 606, as already discussed, the Court extended Speech or Debate Clause protections to congressional aides. The Court distinguished *Kilbourn*, noting that in *Kilbourn* (and other cases permitting civil actions against aides), "relief could be afforded [against the aide] without proof of a legislative act or the motives or purposes underlying such an act." *Id.* at 620-21. By contrast, if the lawsuit requires proof of a legislative act or the motive for such an act, then the aide can assert the Speech or Debate Clause protections. *Id.* at 621-22. Notably, the Court clarified in a footnote that its holding did not apply to cases in which the defendant was neither a member of Congress nor an alter ego of a member: "We do not intend to imply, however, that in no grand jury investigations or criminal trials *of third parties* may third-party witnesses be interrogated about legislative acts of Members of Congress." *Id.* at 629 n.18 (emphasis added).

The cases now before us present the situation contemplated in the footnote in *Gravel*, because the defendants in these cases are neither members of Congress nor aides of members, and as the *Gravel* footnote suggests, this fact is significant as regards the evidentiary application of the Clause.[4] In a civil or criminal

---

[4] Under Judge Randolph's approach, a "case can go forward" if it "does not inquire into legislative motives or question conduct part of or integral to the legislative process," but should be dismissed if it

21

suit against a member or an aide, any inquiry into legislative acts amounts to an impermissible "question[ing]," in violation of the Speech or Debate Clause. *See Helstoski*, 442 U.S. at 489; *Brewster*, 408 U.S. at 525. This rule makes sense because, in order to defend the suit fully, the member or aide would have to respond to any evidence of legislative acts introduced against him, no matter the source of the evidence, and the member's silence might work to his disadvantage. In these cases, on the other hand, the defendants are not members or aides but employing offices, entities that cannot themselves assert the protections of the Speech or Debate Clause. The purposes behind the Speech or Debate Clause are not implicated by an inquiry into legislative acts in such cases, as the suits threaten neither the independence of the legislature as a whole nor of the individual members. Because the members are not defendants, the suits do not burden them with defense costs nor place them at any risk of personal liability, and as long as members and their aides are not themselves "questioned," an inquiry into legislative acts does not implicate the Speech or Debate Clause. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). Thus, where the member is not a party, the Clause functions only as a testimonial and documentary privilege, to be asserted by members and qualified aides if they are called upon to produce evidence. We need not explore the precise contours of this privilege today; the district court may address these problems as they arise. Of course, when the

---

would require any inquiry into legislative acts. Op. of Judge Randolph 27. While Judge Tatel purports to join Judge Randolph's opinion in full, he admits that, according to the *Gravel* footnote, at least some evidence of legislative acts may be admitted against third-party defendants. See Op. of Judge Tatel 5. Such a concession effectively undermines Judge Randolph's approach; the possibility of admitting such evidence means that many suits may proceed even if they would entail some inquiry into legislative acts.

privilege makes relevant evidence unavailable, the parties will have to present their cases as best they can without the evidence, as would occur in other instances when non-parties possess privileged information.

IV

The Supreme Court has liberally construed the Speech or Debate Clause, but it still remains tethered to its underlying purpose. *Brewster*, 408 U.S. at 516. Its purpose is not to immunize Congress from all liability; rather, its purpose is to ensure free and unrestrained discussion, debate, and decision relating to legislative matters. We can always hypothesize long cause-and-effect chains by which remote events somehow affect legislative decisions, but these remote events were not the concern of the Framers of our Constitution when they included in that document a clause protecting legislative speech and debate. Rather, they were concerned with much more immediate threats to legislative independence. They were concerned that members of Congress would be arrested or held liable specifically on account of arguments they had voiced in the course of heated debates over pending legislative issues. *Johnson*, 383 U.S. at 182. They were concerned about the political rivalries that naturally arise among the several branches of government, rivalries that might cause a hostile executive or judiciary to harass a member of Congress who had been outspoken about some abuse of power. *Id.* at 179-81. In addressing these concerns, they did not intend "to make Members of Congress super-citizens," *Brewster*, 408 U.S. at 516, who could block all judicial inquiry into their personnel practices and workplace conduct.

Appellants in these actions are not members of Congress entitled to invoke the Speech or Debate Clause, nor are they alter egos of members. Therefore, the Speech or Debate Clause

does not provide a basis for dismissing these actions; rather, it operates as an evidentiary protection for members of Congress and their aides who might be asked to provide evidence in these actions. For these reasons, I agree that we should affirm the district court's orders denying defendants' motions to dismiss.